

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**03/07/2011**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TROY EDWARD THEISS AND | § | |
| LINDA DARLENE THEISS | § | |
| DEBTOR(S) | § | CASE NO.     08-35229-H5-7 |
| | § | |
| AMEGY BANK NATIONAL | § | |
| ASSOCIATION | § | |
| PLAINTIFF(S) | § | ADVERSARY NO.  08-3458 |
| | § | |
| VS. | § | |
| | § | |
| TROY EDWARD THEISS AND | § | |
| LINDA DARLENE THEISS | § | |
| DEFENDANT(S) | § | |

## MEMORANDUM OPINION

Before the Court is the complaint of Amegy Bank, N.A., seeking a determination of the dischargeability of its debt and objecting to debtors' discharge.  Amegy Bank, N.A., alleges that its debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6) and objects to debtors' discharge under 11 U.S.C. § 727(a)(2) and (a)(5).[1]  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and § 157.   This is a core proceeding.

At trial, Amegy Bank appeared by counsel and debtors appeared pro se. The Court observed the witnesses and examined the evidence.  The Court concludes that Amegy Bank, N.A. has failed to prove its allegations by a preponderance of the evidence. Debtors are entitled to their discharge and debtors' debt to Amegy Bank, N.A. is discharged.

---

[1]Amegy Bank initially alleged a violation of 11 U.S.C. § 727(a)(3), but withdrew this allegation at trial.

## I. Background

Mr. Theiss is a plumber.  Theiss did business as Heritage Plumbing Company from 2000 to April 2007, when he incorporated the business as Heritage Plumbing Company LLC. Both before and after incorporating Heritage Plumbing Company LLC, Mr. Theiss used assets he owned personally to conduct his plumbing business.  Those assets included four Ford F150 trucks, a trencher, and a trailer.

During 2007 and 2008, Heritage Plumbing Company LLC had jobs installing plumbing for Ranier Homes, Partners in Building, Canterra Classics, Inc., and Cannon Custom Homes.  To obtain jobs, Heritage responded to requests for proposals for the total cost of the job including materials. If its bid was accepted, Heritage would usually order the materials for the job from suppliers such as Morrison Supply, Winnelson, Northside Plumbing, and Ferguson Enterprises, Inc.  Heritage would usually invoice the contractor three times over the course of the job for labor and materials.

Mrs. Theiss paid the company bills and kept the company books on a software program named "Quickbooks."  The Theiss' accountant prepared tax returns for debtors and the company. Mrs. Theiss also served as a director on a local water board, earning about $300 to $600 monthly, and made additional income by obtaining customers for an electrical service.

Prior to 2007, while operating as Heritage Plumbing Company, the Theisses became indebted to the IRS for past due income taxes.  To pay their personal and business debts, the Theisses opened a line of credit in the amount of $50,000.00 at Amegy Bank, where they also maintained their personal and business checking accounts.  There is no evidence that this original line of credit was secured by any business or personal property of the debtors.

On August 30, 2007, after Heritage Plumbing Company LLC was incorporated, Amegy Bank replaced debtors' personal line of credit with an extension of credit to the corporation. In connection with the August 30, 2007, extension of credit, Amegy Bank had debtors execute a new Credit Agreement and Disclosure in the name of Heritage Plumbing Company LLC, as borrower. According to the terms of the Credit Agreement and Disclosure, Amegy Bank extended the corporation a line of credit of $70,000. In fact, however, Amegy Bank rolled debtors' outstanding $50,000 personal debt into the corporation's new line of credit and extended to the corporation a line of credit of only an additional $20,000.

In addition to having debtors execute a Credit Agreement and Disclosure in the name of Heritage Plumbing Company LLC, as borrower, Amegy Bank had debtors execute personal guarantees of the corporation's line of credit and two security agreements. The first Commercial Security Agreement names Heritage Plumbing Company LLC as grantor and pledges all of grantor's inventory, chattel paper, accounts, equipment, and general intangibles to Amegy Bank to secure the line of credit.

The second Commercial Security Agreement names Troy Theiss, d/b/a Heritage Plumbing Co. as grantor and Heritage Plumbing Company LLC as borrower. Under that Commercial Security Agreement, Troy Theiss as grantor pledges to Amegy Bank as collateral to secure the debt of borrower, Heritage Plumbing Company LLC, a 2003 Ford F150 (VIN 1FTRW07L23KC93236). That agreement states:

> Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of the Agreement.
> . . . .
> NOTICE OF FINAL AGREEMENT. THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THIS LOAN CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE

PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS LOAN.

During September 2007, Heritage Plumbing Company LLC drew down $17,000 from its line of credit.  In 2008, housing starts declined severely, fewer contractors were building new homes, and Heritage Plumbing Company LLC was unable to get as many plumbing jobs as the company had done in the past. Heritage Plumbing Company LLC drew down the remainder of the line of credit in February 2008.  Heritage Plumbing Company LLC timely paid all monthly payments to Amegy Bank in accordance with the terms of the credit agreement through June 30, 2008.  Despite the lack of work, Heritage Plumbing Company LLC paid its suppliers a total of $94,743.09 for job materials in 2008, as well as other bills incurred in the business.

At some point a creditor froze debtors' bank accounts and debtors had little or no income. In order to pay their bills and mortgage on their home, Mrs. Theiss took a part-time job, earning about $700 every other week.  In addition, debtors began liquidating their personal investments and sold some of their personal property. On February 1, 2008, Mr. Theiss liquidated his SEP retirement plan for $37,800.23.  On February 4, 2008, debtors cashed in a whole life insurance policy for $12,000.00. On March 28, 2008, Mrs. Theiss sold her shares of stock in UGI Corporation, for $2,782.84. On July 21, 2008, Mr. Theiss sold his oldest truck, a 2002 Ford F150, for $2,500.  On August 6, 2008, Theiss sold his trencher and trailer for $3,700.00.  Debtors received a total of $58,783.07 from liquidating their personal assets.

In addition to paying their bills, debtors used some of the proceeds from the sale of their personal property to gamble.  According to debtors' schedules and statement of affairs, during 2008,

debtors experienced gambling winnings of $15,503.00, and gambling losses of $39,200.00. Debtors' records show that they lost a similar amount in 2007.

On August 6, 2007, the Theisses were served with a lawsuit. On August 7, 2008, the Theisses filed their chapter 7 bankruptcy petition. Amegy filed the instant adversary proceeding on November 26, 2008. On January 27, 2009, Amegy Bank sold its collateral and credited $4,850.00 to its debt, leaving a remaining unpaid balance of $65,049.99.

Amegy Bank contends that its debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A) and (B), alleging that in connection with its extension of credit to Heritage Plumbing Company LLC in August 2007, debtors committed fraud and misrepresented the assets of Heritage Plumbing Company LLC in a credit application. In addition, Amegy Bank contends that in selling their personal property to pay their bills, debtors converted the bank's collateral committing a nondischargeable willful and malicious injury under 11 U.S.C. § 523(a)(6). Amegy Bank seeks a judgment that its debt is not dischargeable and attorneys' fees and costs pursuant to the line of credit guarantees, and Tex. Civ. Prac. & Rem. Code § 38.001 et. seq.

## II. 11 U.S.C. § 523(a)(2)

Amegy Bank contends that in connection with its extension of credit to Heritage Plumbing Company LLC in August 2007, debtors misrepresented the ownership of assets used in debtors' business in violation of 11 U.S.C. § 523(a)(2)(A). In addition, Amegy Bank contends that debtors provided the bank with financial statements that contain material misrepresentations in violation of 11 U.S.C. § 523(a)(2)(B).

Under the Commercial Security Agreement executed by Heritage Plumbing Company LLC in August 2007, Heritage Plumbing Company LLC pledged its equipment to Amegy Bank as

collateral for its line of credit.   Amegy Bank alleges that the "equipment" referenced in the Commercial Security Agreement consisted of debtors' four Ford F150 trucks, the trencher, and the trailer.

Amegy Bank relies on only one document to support its allegations of fraud and false financial statement in extending credit to Heritage Plumbing Company, LLC on August 24, 2007. Amegy Bank introduced into evidence a copy of a credit application, Amegy Exhibit 11, dated August 24, 2007.   Much of Amegy Exhibit 11 is illegible.[2]

Despite the blurriness of the document, one of the boxes on Amegy Exhibit 11 appears to ask for a value for the total assets of Heritage Plumbing Company, LLC.   The handwritten answer in that box is $84,209. The credit application also has a box that appears to ask for gross income of Heritage Plumbing Company LLC.   The handwritten answer in that box is $1,165,581. In addition, the credit application has a box that appears to ask for the total liabilities of Heritage Plumbing Company, LLC.   The handwritten answer in that box is $54,133.   The four Ford F150 trucks, trencher, and trailer are not shown on the credit application.

---

[2]Counsel for Amegy Bank, recognizing that the credit application signed by Mr. Theiss is largely unreadable, sought to overcome this obstacle by introducing a blank version of the form. Upon close scrutiny, however, the Court finds that the blank form is different from the  form signed by the Theisses.  The language of the two forms is in a distinctly different arrangement. The discrepancies between the two forms combined with the utter illegibility of the document signed by debtors plus the leading and confusing  questions  by counsel for Amegy Bank resulted in testimony by Mr. Theiss that the Court finds not credible.  For example, Amegy Bank's counsel told Mr. Theiss and Mr. Theiss assented, that the net income figure for Heritage Plumbing Company LLC displayed on signed form is $194,571, yet close scrutiny reveals that the number displayed is $174,571. In addition, Amegy Bank's counsel misidentified the dollar value shown for debtors' line of credit with Amegy Bank and total liabilities of the company. When Amegy Bank's counsel questioned Mrs. Theiss about the credit application, Mrs. Theiss could not read Amegy Exhibit 11, whereupon Amegy Bank's counsel pressed Mrs. Theiss to guess an answer concerning IRS debt. Ultimately, counsel instructed Mrs. Theiss to refer to the blank form concerning the issue of whether debt to the IRS was disclosed and led Mrs. Theiss to agree with Amegy Bank's counsel's assertion that, "There is nothing there."

At trial, Amegy Bank asked Mr. Theiss what assets comprised the $84,209, shown on Amegy Exhibit 11. Theiss testified that he does not remember. Theiss testified that although he agrees that the signatures on the credit application are his and that of his wife, he does not remember providing any information about assets to the bank in connection with the August 2007 line of credit to Heritage Plumbing Company LLC. Theiss testified that he thought that the only time he gave financial information to his loan officer was when he took out the original personal line of credit.[3]

Theiss testified that as to the original line of credit, he met with an Amegy Bank loan officer in person. Theiss testified that he and the loan officer discussed the assets he used in his plumbing business, Heritage Plumbing Company. Theiss testified that two of his four trucks were already encumbered by purchase money liens. Theiss testified that, in addition to the 2003 Ford F150 truck that is the subject of the Commercial Security Agreement, he offered his 2002 Ford F50 truck to the loan officer as collateral for the original line of credit. Theiss testified that the loan officer declined to take the 2002 Ford F150 truck as collateral for the line of credit because of its age and mileage. Theiss testified that the bank officer was interested in a pledge of Theiss' trencher and trailer until Theiss told him that the equipment was seven years old and required "high maintenance." Theiss testified that he does not believe Amegy Bank took a security interest in any collateral other than the 2003 Ford F150. The Court finds Mr. Theiss' testimony about his discussion with the loan officer and application process to be credible.

Amegy Bank presented its witness, Mark Lenderman. Mr. Lenderman began working for Amegy Bank on March 30, 2009, two years after the events at issue occurred. Mr. Lenderman has worked in the banking industry since 1994. Mr. Lenderman is employed by Amegy Bank in

---

[3]Amegy Bank did not introduce into evidence any documentation about its original extension of credit to the debtors.

The Woodlands, Texas, as an assistant vice-president, collection analyst, in charge of recovery on charged-off debt. After establishing these facts, Mr. Lenderman testified as follows:

Q. And did you do the same or similar work at the other banks you worked for?

A. Yes.

Q. So you're familiar with policies and procedures of the banks and what they rely upon for making loans?

A. Yes.

Q. Uh, I'll have you first look at Exhibit 11 in the blue book, please . . .

Q. You were in the court when Mr. and Mrs. Theiss testified as to this credit application. Was this part of the business records of Amegy Bank?

A. Yes.

Q. And is this a standard credit application that they took for these lines of credits?

A. It is.
. . . .

Q. Would Amegy have increased the line of credit if it had known that they had a large outstanding debt to the IRS?

A. No.

Q. Do they rely upon this financial statement before they make their credit decision
. . .

A. Yes.

Q. . . . to advance the line of credit?

A. Yes.
. . .

Q. The Theisses defaulted under their the line of credit and never repaid Amegy, did they?

A. Not in full.

. . .

Q. Now looking at Exhibit 2, in the same book, the collateral for this loan, besides accounts, were inventory, accounts receivable and equipment and general intangibles and chattel paper, is that correct?

A. It is.

Q. You heard Mr. Theiss' testimony that they have a unencumbered Ford, a Top Hat, and a trailer that were all part of the equipment of Heritage Plumbing, did you not?

A. I did.

Q. Would Amegy have consented to the sale of those units if they were not going to be paid any proceeds from the sale of those?

A. No.

Q. Did Amegy know that they sold those?

A. No.

Q. Did Amegy ever receive any proceeds from the sale of those equipment?

A. No, they did not.

Q. Now under accounts, technically all money that comes into Heritage's bank account is part of your cash collat, uh, is part of Amegy's cash collateral, isn't it?

A. Yes.

Q. Would you expect owners or Amegy expect owners to take large distributions to themselves when there is still an outstanding debt?

A. No, they wouldn't.

Q. If Amegy knew that they were taking out large distributions to go gambling would they have maybe done something or inquired further into the repayment of the loan?

A. They would have looked into it yes.

Bankruptcy Code § 523(a)(2) provides that a discharge under § 727 does not discharge an individual debtor from any debt, as follows:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>
> (B) use of a statement in writing--
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive . . .

11 U.S.C. § 523(a)(2)(A) and (B).

In RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995), the Fifth Circuit explained false pretenses, a false representation, and actual fraud under 11 U.S.C. § 523(a)(2):

> [F]or a debtor's representation to be a "false representation or false pretense" under § 523(a)(2), it must have been: (1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party.
>
> . . . In order to prove nondischargeability under an "actual fraud" theory, the objecting creditor must prove that: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations."

RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995) (internal quotations and citations omitted.)

Reliance under § 523(a)(2)(A) must be justifiable. In re Acosta, 406 F.3d 367 (5ᵗʰ Cir. 2005).

The Fifth Circuit explained justifiable reliance in Lewis v. Bank of America NA, 343 F.3d 540, 547

(5ᵗʰ Cir. 2003) as follows:

> Common law fraud, moreover, requires a plaintiff to show not only that a misrepresentation was made, but also that he or she justifiably relied on the alleged misrepresentation. Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.2001). The "justifiable reliance" element of common law fraud does not require a plaintiff to demonstrate reasonableness. Field v. Mans, 516 U.S. 59, 70-71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (citing Restatement (Second) of Torts § 545A, comment b ). However, a fraud plaintiff "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. at 71, 116 S.Ct. 437 (citing Restatement § 541, comment a ). Moreover, a person may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted." In re Mercer, 246 F.3d 391, 418 (5th Cir.2001) (applying the "justifiable reliance" fraud standard in the federal bankruptcy setting).

Lewis v. Bank of America NA, 343 F.3d 540, 547 (5ᵗʰ Cir. 2003).

In contrast to the justifiable reliance required under § 523(a)(2)(A), reliance under

§523(a)(2)(B) must be reasonable.  In re Allison, 960 F.2d 481 (5ᵗʰ Cir. 1992) ("Indeed, section

523(a)(2)(B), addressing "use of a statement in writing," expressly recites reasonable reliance as an

essential element to the discharge exception. Section 523(a)(2)(A) contains no such requirement.")

Reasonable reliance is explained by the Fifth Circuit in Matter of Coston, 991 F.2d 257 (5ᵗʰ Cir.

1993):

> The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances. The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

Matter of Coston, 991 F.2d 257 (5ᵗʰ Cir. 1993).

The Supreme Court in <u>Field v. Mans</u>, 516 U.S. 59, 76-77 (1995), explains why §523(a)(2)(B) requires a lender to establish reasonable reliance while § 523(a)(2)(A) requires proof of only justifiable reliance:

> There remains a fair question that ought to be faced. It makes sense to protect a creditor even if he was not quite reasonable in relying on a fraudulent representation; fraudulence weakens the debtor's claim to consideration. And yet, why should the rule be different when fraud is carried to the point of a written financial statement? Does it not count against our reading of the statute that a debtor who makes a misrepresentation with the formality of a written financial statement may have less to bear than the debtor who commits his fraud by a statement, perhaps oral, about something other than his bank balance? One could answer that the question does have its force, but counter it by returning to the statutory history and asking why Congress failed to place a requirement of reasonable reliance in § 523(a)(2)(A) if it meant all debtors to be in the same boat. But there may be a better answer, tied to the peculiar potential of financial statements to be misused not just by debtors, but by creditors who know their bankruptcy law. The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge. FN13 The answer softens the ostensible anomaly.
>
> FN13. "It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase 'I have no other debts' is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting." H.R.Rep. No. 95-595, pp. 130-131, U.S. Code Cong. & Admin. News 1978 pp. 5787,6091 (1977) (footnote omitted).

<u>Field v. Mans</u>, 516 U.S. 59 at 76-77.

The Court notes that Mr. Lenderman is not a loan officer for Amegy Bank and does not claim

to have ever been a loan officer at any lender.[4]  Mr. Lenderman testified that Amegy Bank relied on

Amegy Exhibit 11 in making its credit decision and that he is familiar with the policies and

_____

[4]A bank has the burden of showing that its designated representative has sufficient personal knowledge to testify as to the reliance of the loan committee on the veracity of the information contained in debtor's loan submissions. First Nat. Bank of Louisville v. Lustig, 96 F.3d 1554, 1576 (5th Cir. 1996).  In First Nat. Bank of Louisville v. Lustig, 96 F.3d 1554, 1576 (5th Cir. 1996), the Fifth Circuit held that in weighing the reliability of the testimony of the bank's designated representative as to what the loan committee considered and relied on in approving debtor's loans, the fact finder may take into account the fact that bank's designated trial witness was not present at the loan committee meetings considering debtor's loans as well as the fact that the witness had worked for the bank for many years and was intimately familiar with the role of the account officer and the reliance that the loan committee places on those officers to provide accurate and truthful information.  The Fifth Circuit held:

> FNBL had the burden to show that Morton had sufficient personal knowledge to testify as to the reliance of the FNBL loan committee on the veracity of the information contained in DeWitt's loan submissions. Morton testified that she worked for FNBL for many years and was intimately familiar with the role of the Morton testified that she worked for FNBL for many years and was intimately familiar with the role of the account officer and the reliance that the loan committee places on those officers to provide accurate and truthful information. The jury knew that Morton was not present at the DeWitt loan committee meetings and could take that fact into account in weighing the reliability of her testimony. FNBL's business records relating to the DeWitt loans were admitted without objection. Morton's testimony and DeWitt's records relating to the eight loans at issue presented direct evidence that the jury could consider in determining what the loan committee considered and relied on in approving these loans.

> The important question is not whether the trial court improperly admitted hearsay testimony, but whether Morton had adequate knowledge to testify as to the normal practice followed by the FNBL loan committee in approving loans.We find that Morton had sufficient knowledge to testify as to the loan approval procedures of the loan committee and the bank itself. While Morton did not physically observe DeWitt's loan committee meetings, we believe her knowledge is sufficient to permit the conclusion that Morton was familiar with the procedure. The testimony permits the conclusion that the loan committee would rely on the veracity of the loan officer's paperwork in deciding whether to approve a loan.

First Nat. Bank of Louisville v. Lustig, 96 F.3d 1554, 1576 (5th Cir. 1996).

procedures "the banks" utilize in making credit decisions.  Mr. Lenderman did not, however, explain what Amegy Bank's procedure is for loan approvals generally or for debtors' loan specifically.

Mr. Lenderman did not testify about the contents of Amegy Exhibit 11.  Mr. Lenderman did not identify any misrepresentations or omissions in Amegy Exhibit 11.  Mr. Lenderman did not identify any misrepresentations by debtors.Mr. Lenderman did not testify about any representations made by debtors in connectionwith either the original loan to debtors or the extension of credit to the corporation.

During Mr. Lenderman's testimony, counsel for Amegy Bank implied that debtors omitted a "large outstanding debt to the IRS" from their credit application and Mr. Lenderman opined that the bank would not have increased the line of credit if it had known debtors had a "large outstanding debt to the IRS."

First, debtors obtained the original extension of credit with the express purpose of paying taxes to the IRS, among other things.  There is no evidence that the bank was unaware of this purpose when it extended the original line of credit to debtors or when it increased the line of credit in August 2007.  See Matter of Lawson, 54 B.R. 103,104 (Bankr.Ohio1985) ("Plaintiff has failed to prove a false representation made by any of the defendants. Barbara Inez Lawson asked for the loans for the purpose of paying business expenses and taxes. When she received the money she used the funds for the purpose she had stated to plaintiff. There is no evidence of an intent to deceive plaintiff. Since there was no proof of a false representation and no proof of an intent to decieve,[sic] plaintiff has failed to meet the burden of proof of two of the elements of fraud. Further discussion of the remaining elements is needless.")

Second, there is no credible evidence of the amount of debtors' IRS debt at the time of the original loan or at the time of the extension of credit to the corporation. Moreover, the credit application, Amegy Exhibit 11, discloses outstanding liabilities of $54,133 and there is no evidence that this figure does not include debt owed to the IRS.[5] Other than agreeing to counsel's innuendo about omitted IRS debt, Mr. Lenderman did not identify any acts, omissions, or statements constituting false pretenses, false representations or actual fraud made by debtors.

The remainder of Mr. Lenderman's testimony concerns events that occurred after Amegy Bank extended credit to the debtors.  Bankruptcy Code § 523(a)(2)(A) requires reliance on misrepresentations made in connection with obtaining credit, not representations that occur later. See In re Thompson, 315 B.R. 94, 101 (Bankr. W.D.Mo. 2004) ("Wieberg argues that the Thompsons made false representations when, after acknowledging that some cattle were missing in early 2003, they continued to assure him that cattle remained sufficient to satisfy his debt. This section of the Code, however, requires proof of a misrepresentation at the time credit is given, extended, renewed, or refinanced. The only time Wieberg extended credit to the Thompsons was on January 17, 2002. Wieberg offered no evidence that the Thompsons intended to deceive him when they executed the Agreement. . . . Since Wieberg failed to prove that any misrepresentation took place at the time of the Agreement, he failed to satisfy one of the essential elements of fraud. Any

---

[5]It is in connection with this dollar amount that Amegy Bank's counsel told Mr. Theiss, during questioning, that this figure represented his outstanding line of credit to Amegy Bank, to which statement Mr. Theiss assented.  The Court finds Mr. Theiss' testimony on this point to be not credible given that the parties to this case on each side have always maintained that Amegy Bank extended an original line of credit to debtors in an amount limited to and, not in excess of, $50,000.  If it is true, however, that Amegy Bank permitted debtors to borrow an amount in excess of $4,000 over their credit limit, then Amegy Bank plainly did not rely on any representation by debtors in deciding to extend additional credit.

other alleged misrepresentation did not take place in the furtherance of obtaining credit, thus, it is not subject to this Code section. I, therefore, find in favor of the Thompsons as to the 11 U.S.C. § 523(a)(2)(A) count.")

As to Amegy Bank's allegation that debtors misrepresented the ownership of debtors' four trucks, trencher, and trailer, Amegy Bank presented no evidence establishing that in extending credit to debtors or their corporation, it understood or believed that the $84,209 shown on the credit application or the equipment referenced in the Commercial Security Agreement executed by Heritage Plumbing Company LLC, was comprised of the four trucks, trencher and trailer. Amegy Bank presented no evidence supporting its allegation that debtors represented that the $84,209 shown on the credit application consisted of the four trucks, trencher and trailer.

Amegy Bank's argument that Mr. Theiss represented to the bank that the corporation owned the four trucks, trencher and trailer, is inconsistent with its own documentation of the loan and the uncontradicted testimony of Mr. Theiss. The evidence shows that in the Commercial Security Agreement he executed August 30, 2007, Troy Theiss represented to the bank that he personally owned the 2003 Ford F150 truck pledged under that agreement. Consistent with his execution of the Commercial Security Agreement, wherein Troy Theiss expressly represented to the bank that he personally owned the truck described in that agreement, Mr Theiss testified that he also offered his oldest truck as collateral for the loan, but the loan officer declined. Theiss testified that the loan officer was interested in a lien against the trencher and trailer until Mr. Theiss explained that the equipment was seven years old and required high maintenance. Further, two of the four trucks were already encumbered by purchase money security interests. The Court finds that Amegy Bank has

failed to prove that the Theisses represented to the bank in the credit application or otherwise, that Heritage Plumbing Company, LLC owned the four trucks, trencher and trailer.

Any reliance by Amegy Bank on a representation contrary to debtor's express representation in the executed Commercial Security Agreement is not reasonable or justifiable. See Highland CrusaderOffshore Partners LP v. LifeCare Holdings Inc., 377 Fed.Appx. 422 (5th Cir. 2010) ("[I]f a party knows that a representation is false before acting upon it, he cannot reasonably rely on the misrepresentation and has no claim for fraud or negligent misrepresentation. [W]hen a person makes his own investigation of the facts, and knows the representations are false, he cannot, as a matter of law, be said to have relied upon the misrepresentations of another." (Internal citations omitted.)

In addition, the Court finds that there is no evidence that debtors intended to defraud Amegy in submitting the credit application, in obtaining the original loan or in obtaining the extension of credit to the corporation.  The Court finds that Amegy Bank failed to prove that debtors made any misrepresentations to Amegy Bank in the credit application or otherwise concerning the ownership of property used in Theiss' business generally or about the ownership of the four Ford F150 trucks, trencher and trailer, specifically. The Court finds that Amegy Bank failed to prove that debtors made any misrepresentations to the bank about the extent of their personal or corporate liabilities, or the value or existence of any personal or corporate assets.  Amegy Bank has presented no evidence that debtors made any material misrepresentations about debtors' financial condition or that of their company in Amegy Exhibit 11.

The Court finds that Amegy has failed to prove that debtors obtained the original loan or the loan to their corporation by false pretenses, a false representation, or actual fraud, or by use of a false financial statement under §  523(a)(2)(A) or (B).

### III. 11 U.S.C. § 523(a)(6)

Amegy Bank contends that Heritage Plumbing Company LLC's equipment covered by the credit agreement included all of the equipment that was used by Mr. Theiss doing business as Heritage Plumbing Company.  Amegy Bank contends that by selling the trencher, trailer and the oldest Ford F150 truck, debtors converted Amegy Bank's collateral.  Amegy Bank contends that these actions constitute  a willful and malicious injury to the property of Amegy Bank in violation of 11 U.S.C. § 523(a)(6).

Bankruptcy Code § 523(a)(6) provides that a discharge under § 727. . . does not discharge an individual debtor from any debt:

> . . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . .

11 U.S.C. § 523(a)(6).

Under Texas law, conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights. Arthur W. Tifford, PA v. Tandem Energy Corp., 562 F.3d 699 (5th Cir. 2009). In In re Modicue, 926 F.2d 452, 453 (5th Cir. 1991), the Fifth Circuit explained that conversion may cause a willful and malicious injury that is nondischargeable under 11 U.S.C.§ 523(a)(6) and described the measure of damages for the injury:

> Section 523(a)(6) excepts liability for a "willful and malicious injury by the debtor to another entity or the property of another entity" from the general discharge of debts accorded the debtor under § 727 of the Bankruptcy Code. This encompasses the wrongful sale or conversion of encumbered property by the debtor. See, In re Howard, 6 B.R. 256 (Bankr.M.D.Fla.1980); Collier on Bankruptcy 523.16[3]. In this case, the Modicues have not appealed the bankruptcy court's determination that their sale of the mortgaged property falls within the purview of § 523(a)(6). Thus, the only

issue before this court is the appropriate measure of the exception to dischargeability under § 523(a)(6).

Section 523(a)(6) is based on tort principles rather than contract. In re Howard, 6 B.R. at 258, Collier on Bankruptcy 523.16. It is designed to compensate the injured party for the injury suffered while not allowing the debtor to escape liability for a "willfull and malicious" injury by resort to the bankruptcy laws. Thus, the appropriate measure for non-dischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis. In this case, the injury to Friendly is the loss of the collateral securing the Modicue's indebtedness to which Friendly would have had priority upon liquidation of the bankruptcy estate. Therefore, under § 523(a)(6), Friendly is entitled to the value of the collateral denied it by the Modicue's wrongful actions. Any other construction of § 523(a)(6) would allow Friendly, an under-secured creditor, to improve its position in the bankruptcy setting because of the debtor's wrongful conduct. Such a result is contrary to the equities and policy goals embodied in the Bankruptcy Code. See, In re Howard, 6 B.R. at 258.

> Friendly also claims that the appropriate measure of the injury caused by the wrongful sale of the property is the value of the property at the time it was mortgaged rather than the depreciated value of the property at the time it was sold by the debtor. For the same reasons enumerated above, we reject this contention. The bankruptcy court and the district court correctly concluded that the appropriate measure of the non-dischargeable injury is the fair value at the time the property was sold. As the district court reasoned, any other measure would put Friendly "in a better position because of defendant's misconduct than it would otherwise have enjoyed, [Friendly's] actual loss is the value of the collateral had at the time of the wrongful sale." See First State Bank of Alsip v. Iaquinta, 98 B.R. 919 (Bankr.N.D.Ill.1989).

In re Modicue, 926 F.2d 452, 453 (5th Cir. 1991).

The Court finds that Amegy Bank did not have a security interest in any of the personal property that debtors sold prior to filing bankruptcy. Amegy Bank has failed to prove that debtors converted any property in which Amegy Bank held a security interest. The Court finds that Amegy Bank has failed to prove that debtors violated 11 U.S.C.§ 523(a)(6) in disposing of their personal property.

### IV. 11 U.S.C. § 727(a)(2)

Amegy Bank contends that debtors are not entitled to a discharge under 11 U.S.C. § 727(a)(2) because debtors have, with the intent to hinder, delay or defraud creditors, sold asset of Heritage Plumbing Company LLC that were subject to Amegy Bank's lien without remitting the proceeds to Amegy Bank.

Bankruptcy Code 727(a) provides:

(a) The court shall grant the debtor a discharge, unless–
. . . .
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition . . .

11 U.S.C. § 727(a)(2).

The Fifth Circuit in In re Laughlin, 602 F.3d 417 (5th Cir. 2010) states that the burden of proof of a creditor objecting to debtor's discharge under 11 U.S.C. § 727(a)(2) is as follows:

The creditor "bears the burden of establishing the elements that would prevent discharge." Cadle Co. v. Pratt (In re Pratt), 411 F.3d 561, 565 (5th Cir.2005). "The exceptions [to discharge] are construed strictly against the creditor and liberally in favor of the debtor." Duncan, 562 F.3d at 695.

To establish that discharge should be denied under § 727(a)(2)(A), a creditor must show four elements: "(1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; [and] (4) with intent to hinder, delay, or defraud a creditor or officer of the estate."

In re Laughlin, 602 F.3d 417 at 421.

In In re Duncan, 562 F.3d 688 (5th Cir. 2009), the Fifth Circuit describes the elements of an objection to discharge under § 727(a)(2)(A):

To establish a claim under § 727(a)(2)(A), the plaintiff must prove the following four elements: "(1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate." Pavy v. Chastant (In re Chastant), 873 F.2d 89, 90 (5th Cir.1989). Constructive intent is inadequate; proof of actual intent is necessary, see id. at 91, which can be inferred from the debtor's actions and circumstantial evidence, Perez, 954 F.2d at 1029.

This circuit has adopted a six-factor test to evaluate evidence of actual intent to defraud under § 727(a)(2)(A):

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Chastant, 873 F.2d at 91 (quoting In re Schmit, 71 B.R. 587, 590 (Bankr.D.Minn.1987)). A presumption of actual fraudulent intent arises if the debtor transfers property gratuitously or to a relative. Id. If the plaintiff can demonstrate either of these facts, then the burden shifts to the debtor to prove that he lacked fraudulent intent. Id. The presence or absence of fraudulent intent is a finding of fact, and is reviewed under the clearly erroneous standard. Dennis, 330 F.3d at 701.

In re Duncan,562 F.3d 688, 698 (5th Cir. 2009).

In Duncan, the Fifth Circuit upheld the bankruptcy court's finding that although debtor had transferred his stock and real property to a close relative and had retained beneficial use of the real property, the creditor nevertheless failed to prove that debtor made the transfers with actual fraudulent intent. Id. at 698-699.

The Fifth Circuit in Duncan concluded:

The bankruptcy court weighed the evidence relating to these factors, looking "to the surrounding facts and circumstances, the credibility of [Duncan's] testimony, and the general chronology of events," and found that Duncan "did not have actual fraudulent intent 'to hinder, delay or defraud his creditors' in transferring the stock and his interest in Briargrove". Viewing the record in light of the deferential standard of

review, we cannot say this finding is clearly erroneous, and we reject Cadle's §
727(a)(2) claim.

In re Duncan, 562 F.3d 688, 699 (5th Cir. 2009).

The evidence shows that debtors sold their personal property to unrelated third parties, not
to friends or relatives. There is no evidence that the consideration paid for any item was inadequate.
The debtors had little other income at the time they liquidated their property and at some point their
bank accounts were frozen. Debtors sold their personal property and liquidated their investments
because debtors needed to pay their bills and their mortgage. Housing starts had declined severely
and Heritage Plumbing Company LLC had far fewer jobs than in the past and, therefore, debtors'
income was reduced. In regard to the lawsuit served on debtors the day before debtors filed
bankruptcy, debtors testified that their bankruptcy filing was not triggered by service of the lawsuit
and indicated that they had decided to file bankruptcy before they were aware of the lawsuit.

The Court credits the testimony of Mr. Theiss and Mrs. Theiss as to their motives in
disposing of their property. The Court finds that debtors did not have an intent to hinder, delay or
defraud any creditor or an officer of the bankruptcy estate when they disposed of their property. The
Court finds that Amegy Bank has not proven that debtors violated 11 U.S.C. § 727(a)(2).

### V. 11 U.S.C. § 727(a)(5)

Amegy Bank contends that debtors are not entitled to a discharge pursuant to 11 U.S.C. §
727(a)(5) because debtors have failed to explain satisfactorily a loss of assets or deficiency of assets
to meet the debtors' liabilities.

Bankruptcy Code 727(a)(5) provides:

(a) The court shall grant the debtor a discharge, unless–

. . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . .

11 U.S.C. § 727(a)(5).

In In re Retz, 606 F.3d 1189 (9th Cir. 2010), the Ninth Circuit described the objecting party's

burden of proof under section 727(a)(5) as follows:

> Under § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.

> . . . Once the creditor has made a prima facie case, the debtor must offer credible evidence regarding the disposition of the missing assets. Whether a debtor has satisfactorily explained a loss of assets is a question of fact for the bankruptcy court, overturned only for clear error. A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under [§ ] 727(a)(5).

In re Retz, 606 F.3d 1189, 1205 (9th Cir. 2010) (internal citations omitted).

In First Tex. Sav. Ass'n, Inc. v. Reed ( In re Reed ), 700 F.2d 986, 993 (5th Cir.1983), the

Fifth Circuit considered the meaning of the word "satisfactorily" in the context of section 727(a)(5):

> Section 727(a)(5) provides, The court shall grant the debtor a discharge unless ... the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. In this context,

> [t]he word satisfactorily ... may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.

First Tex. Sav. Ass'n, Inc. v. Reed ( In re Reed ), 700 F.2d 986, 993 (5th Cir.1983).

Debtors have explained the disposition of their assets and have produced records corroborating their explanation. Debtors' records include their tax returns, bank statements, sales receipts, the corporate general ledger, balance sheets, profit & loss statements and other "Quickbooks" records of Heritage Plumbing Company LLC, records of Mrs. Theiss stock sale, records of the sales of the trencher and trailer and other personal property, and gambling records. The Court finds that debtors have adequately explained the disposition of their property. Amegy Bank has failed to prove that debtors' explanation of the disposition of their assets is unsatisfactory under § 727(a)(5).

## VI. Conclusion

Amegy Bank has failed to prove that debtors obtained the extension of credit from Amegy Bank by false pretenses, a false representation, or actual fraud, or by use of a false financial statement under 11 U.S.C. § 523(a)(2)(A) or (a)(2)(B). The Court finds that Amegy Bank has failed to prove that debtors violated 11 U.S.C. § 523(a)(6) in disposing of their personal property. The Court finds that Amegy Bank has failed to prove that debtors' discharge should be denied under 11 U.S.C. § 727(a)(2) or (a)(5).

Based on the foregoing, it is

**ORDERED** that debtors' discharge under 11 U.S.C. § 727 is **GRANTED**; it is further

**ORDERED** that debtors' debt to Amegy Bank, N.A., is **DISCHARGED**; it is further

**ORDERED** that adversary proceeding number 08-3458 is ordered **CLOSED**.

Signed this 7 day of March, 2011 at Houston, Texas.

_____

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE